UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: May 21, 2021  Decided: November 19, 2021)

Docket No. 20-2756-cv

────────────────

UNITED STATES OF AMERICA EX REL. HASSAN FOREMAN,
*Plaintiff-Appellant,*

UNITED STATES OF AMERICA,
*Plaintiff,*

v.

AECOM, AECOM GOVERNMENT SERVICES, INC., AC FIRST, LLC, AND
AECOM/GSS LTD. D/B/A GLOBAL SOURCING SOLUTIONS, INC.,
*Defendants-Appellees.**

────────────────

Before:      JACOBS, SACK, and CHIN, *Circuit Judges.*

The plaintiff-appellant Hassan Foreman, on behalf of the United States and himself, filed an action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against defendants-appellees AECOM (a publicly held corporation), AECOM Government Services, Inc., AC First, LLC, and AECOM/GSS Ltd. d/b/a Global Sourcing Solutions, Inc., (collectively, "AECOM") in the Southern District of New York.  AECOM entered into a billion-dollar contract with the United States government to provide maintenance and support services to the United States Army in Afghanistan.  According to Foreman, in order to boost its bottom line, AECOM submitted fraudulent claims for payment to the government.  Foreman alleges that AECOM overstated its man-hour utilization rate, improperly billed the government for labor not actually performed, and failed to properly track government property, resulting in significant financial costs and government waste.  AECOM moved to dismiss, and the district court (Louis L.

───────────────────

* The Clerk of Court is respectfully directed to amend the caption as set forth above.

Stanton, *Judge*) granted the motion. The court concluded that Foreman's false claims under 31 U.S.C. § 3729(a)(1)(A)-(B) failed to plausibly allege materiality and were therefore not actionable under the FCA, and that Foreman failed to state viable reverse false claims or conversion claims under the FCA. We affirm the dismissal of most claims but conclude that the district court's materiality analysis of Foreman's § 3729(a)(1)(A)-(B) claims premised on the labor billing allegations was flawed because the district court improperly relied on materials extraneous to the complaint. We further conclude that the public disclosure bar does not provide an alternative basis to affirm. We therefore

VACATE the judgment, REVERSE the district court's order dismissing the 31 U.S.C. § 3729(a)(1)(A)-(B) claims premised on the labor billing allegations, AFFIRM the dismissal of Foreman's other claims, and REMAND for further proceedings consistent with this opinion.

DANIEL OLEJKO (Patrick J. Conroy, *on the brief*), Bragalone Conroy PC, Dallas, TX, *for Plaintiff-Appellant*;

BENJAMIN D. WHITE (Jenna M. Dabbs, Michael Skocpol, *on the brief*), Kaplan Hecker & Fink LLP, New York, NY, *for Defendants-Appellees*.

SACK, *Circuit Judge*:

This action involves a billion-dollar defense contract entered into between AECOM (a publicly held corporation), AECOM Government Services, Inc., AC FIRST, LLC, and AECOM/GSS Ltd. (collectively, "AECOM") and the United States government, under which AECOM was tasked with providing maintenance and management support services to the United States Army in

Afghanistan. In order to ensure that AECOM effectively and efficiently provided such services, the contract imposed various obligations on AECOM to properly catalog data regarding labor hours and costs, so-called "man-hour utilization" rates, and acquisition and receipt of government property into various government tracking systems. AECOM allegedly failed to live up to these contractual obligations.

Plaintiff-appellant Hassan Foreman, on behalf of the United States and himself, therefore filed an action against AECOM in the Southern District of New York, asserting violations of several provisions of the False Claims Act ("FCA"). According to Foreman, AECOM submitted fraudulent claims for payment to the government, falsely certifying that it was in compliance with its obligations under the contract. In reality, AECOM allegedly overstated its man-hour utilization rate, improperly billed the government for labor not actually performed, and failed to properly track government property, resulting in significant financial costs to the government.

AECOM moved to dismiss Foreman's third amended complaint (the "Complaint"), and the district court (Louis L. Stanton, *Judge*) granted the motion. The district court dismissed Foreman's claims under 31 U.S.C. § 3729(a)(1)(A)-

(B), because it concluded that Foreman had failed to adequately plead materiality as required by *Universal Health Services, Inc. v. United States. ex rel. Escobar* ("*Escobar*"), 136 S. Ct. 1989 (2016).  In reaching this conclusion, the district court considered multiple reports outside of the complaint on the basis that they were either incorporated by reference into, or integral to, the complaint.  The district court also dismissed Foreman's FCA conversion claim brought under 31 U.S.C. § 3729(a)(1)(D) because it concluded that the Complaint failed to identify "any specific excess or recoverable item or other property that defendants possessed but failed to deliver to the government." *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020).  The district court also dismissed Foreman's reverse false claim brought under 31 U.S.C. § 3729(a)(1)(G),[1] because it concluded that the allegations underlying these claims were identical to those underlying his direct false claims under § 3729(a)(1)(A)-(B).  Such duplicative

---

[1]  In contrast to an affirmative false claim, which involves submitting a false or fraudulent claim to the government for payment, a "reverse false claim" "creates FCA liability for false statements designed to conceal, reduce, or avoid an obligation to pay money or property to the Government." *United States ex rel. Lissack v. Sakura Glob. Cap. Mkts., Inc.*, 377 F.3d 145, 152 (2d Cir. 2004); *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) ("In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated.").

allegations, the district court concluded, could not state a viable reverse false claim.

Following the district court's dismissal of the Complaint, Foreman moved for reconsideration. The district court denied the motion and entered judgment in favor of AECOM. Foreman subsequently filed a motion to alter or amend the judgment and requested leave to file a fourth amended complaint. The district court denied the motion, concluding that the proposed fourth amended complaint would be futile.

Foreman now appeals, arguing that the district court erred in dismissing the Complaint and entering judgment for the defendants. Foreman argues in the alternative that the district court erred in denying his post-judgment motion to alter the judgment and file a fourth amended complaint.

For the reasons that follow, we conclude that the district court erred in dismissing the Complaint in its entirety and entering judgment for AECOM. In particular, the district court's materiality analysis of Foreman's § 3729(a)(1)(A)-(B) claims premised on the labor billing allegations was flawed because the court improperly relied on material extraneous to the complaint. The court therefore erred in dismissing these claims at the motion-to-dismiss stage. We also

conclude that the district court properly dismissed Foreman's other claims and that the "public disclosure bar" does not apply. We therefore vacate the district court's judgment, reverse the dismissal of Foreman's § 3729(a)(1)(A)-(B) claims premised on the labor billing allegations, affirm the dismissal of Foreman's other claims, and remand for further proceedings consistent with this opinion.

# BACKGROUND

*Factual Background*[2]

## A. The Parties

Defendants-Appellees AECOM (a publicly held corporation), AECOM Government Services, Inc., AC First, LLC, and AECOM/GSS Ltd., d/b/a Global Sourcing Solutions, Inc., (collectively, "AECOM") are a defense contractor and related corporate entities that contracted with the United States Army to provide logistical support to the 401st Army Field Support Brigade in Afghanistan beginning in 2005.

Relator Hassan Foreman is a former employee of AECOM who worked in its finance department from approximately August 2013 to July 2015. He was hired by AECOM as a finance analyst in August 2013 and promoted to

---

[2] The facts discussed herein are drawn from the Complaint.

supervisor in May 2014. In July 2015, shortly after notifying AECOM of what he saw as compliance issues, he was terminated.

### B. The MOSC-A Contract

In 2010, the Army awarded AECOM a billion-dollar, multi-year defense contract called the Maintenance & Operational Support Contract (the "MOSC-A Contract"). The MOSC-A Contract required the defendants to provide maintenance and management support services to the Army in Afghanistan. These services included maintaining vehicles and equipment, managing facilities, handling supplies and inventory, and providing transportation services at various locations throughout Afghanistan.

The contract had a "cost-plus-fixed-fee" structure, meaning that AECOM was reimbursed for the costs that it incurred on the Army's behalf and received an additional negotiated fee that was fixed at the inception of the contract. In this case, AECOM obtained a 5% fixed fee that "does not vary with actual cost, but may be adjusted as a result of changes in the work to be performed under the contract." A.324-25 ¶ 10.[3] Foreman alleges that this cost-plus-fixed-fee structure

---

[3] As used in citations herein, "A" refers to the Joint Appendix submitted on appeal by the parties. Unless otherwise noted, any paragraph numbers cited herein refer to paragraphs in Foreman's Complaint.

incentivized AECOM to maintain and increase the level of costs to the government because it would increase the value of the 5% fixed fee.

When it was first awarded in 2010, the MOSC-A Contract was to be effective for one year; it was, however, extended several times between 2010 and 2018. The MOSC-A Contract required the government to consider AECOM's previous performance in determining whether to award AECOM additional option years under the contract. From 2010 through 2018, the Army repeatedly amended, modified, or extended the contract, with the vast majority of the amendments and modifications increasing the funding for the MOSC-A Contract.

The cost of the MOSC-A Contract, with its options to extend, was originally estimated to be $378 million total. But AECOM billed as much as $400 million annually under the contract, and a 2018 amendment to the contract listed a total dollar amount of at least $1.3 billion. By the time the United States military withdrew from Afghanistan at the end of August 2021, the total amount paid to AECOM pursuant to the MOSC-A Contract was approximately $1.9 billion.

*C. Alleged Violations of the MOSC-A Contract*

Foreman alleges that AECOM and its employees violated the MOSC-A Contract and various federal regulations that were incorporated into it. These alleged violations fall into three principal categories: (1) improper labor billing; (2) inflated reports of the man-hour utilization rate; and (3) improper purchasing, tracking, and returning of government property.[4]

To prevent fraud and ensure accountability, the MOSC-A Contract imposed specific obligations on AECOM with respect to documenting its work and labor costs. For example, the MOSC-A Contract required that AECOM use the "AWRDS/LMP/MWB" or "SAMS-E/SAMS-IE" system for labor reporting, update those systems daily, and provide weekly reports of labor hours worked and funds expended for parts. In addition, various applicable Federal Acquisition Regulations ("FAR")[5] required AECOM to account for costs,

---

[4] Foreman also alleged that AECOM entered into a "crony contract," and that his termination was unlawful retaliation. The district court dismissed those claims and Foreman does not press them on appeal. Foreman has therefore waived any challenge to the district court's dismissal of those claims. *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

[5] "The FAR are a set of regulations promulgated by the [General Services Administration] to further the uniform regulation and procurement of government contracts." *Rutigliano Paper Stock, Inc. v. U.S. Gen. Servs. Admin.*, 967 F. Supp. 757, 761

maintain adequate records to demonstrate any costs that have been incurred, and meet specific criteria regarding costs.

The MOSC-A Contract also established a man-hour utilization ("MHU") rate of 85 percent with a goal of 90 percent. An MHU rate is the ratio of time that personnel spend actively engaged in maintenance projects (actual direct labor hours) relative to their overall time on duty. In other words, the MHU rate is calculated by dividing the actual direct labor hours by the direct labor hours available to perform maintenance projects.

AECOM was required to report the MHU rate on a monthly basis. Such reporting allows the Army to review and verify utilization data for tactical field maintenance services and determine whether reductions in contractor personnel should be made. In Performance Work Statements incorporated by reference into the MOSC-A Contract, the Army identified the MHU rate as a critical metric.

The MOSC-A Contract and FAR also imposed specific obligations on AECOM regarding the management and tracking of government property. AECOM was required to have a system in place to manage government property

---

(E.D.N.Y. 1997); *see also Irvin Indus. Canada, Ltd. v. U.S. Air Force*, 924 F.2d 1068, 1069 (D.C. Cir. 1990) ("The Federal Acquisition Regulations System was established in 1983 for the purpose of codifying and publishing uniform practices and procedures for acquisitions by all executive agencies.").

in its possession and to keep detailed records reflecting its acquisition and receipt. It was also required to acquire government property using the government supply system as its first source of supply, and to report its receipt and processing of all property through specified tracking systems, known as SARSS, LMP, and AWRDS/MWB. Performance Work Statements indicate that the Army considered it a "critical metric" that AECOM's inventory accuracy be at least 98 percent and that AECOM ensure, with at least 95 percent accuracy, the entry of correct equipment condition and location codes "into the appropriate Logistics Information System (LIS) (AWRDS, SAMS, SARRSS/LMP, PBUSE, PBUSE AIT) IAW." A.410 ¶ 206. The MOSC-A Contract also required AECOM to track and submit to the Army, through a process known as "recoverables," parts removed from vehicles and other equipment.

### 1. The Labor Billing Allegations

According to the Complaint, AECOM submitted inaccurate timesheets to the government resulting in payment for work not actually performed. AECOM's timesheets allegedly listed incorrect hour totals, omitted employee numbers, and did not contain the supervisor's printed name, making it difficult to identify the person who signed the timesheets. In addition, timesheets were

signed by supervisors who were not on-site and therefore could not validate employees' work hours. AECOM employees also signed and submitted timesheets for the pay period before work had been performed and, in several cases, submitted multiple timesheets for the same person. On one occasion in 2016, six employees each billed for several hours of work involving the replacement or repair of a single tire. And it was common for employees to fall asleep on the job or not show up for work, while still billing full eleven-hour days.

Foreman alleges that these timesheet errors were the result of explicit AECOM policy. For example, AECOM documents contained instructions to employees to submit their timesheets on the Thursday prior to the end of the two-week pay period. It was also AECOM's policy and practice to bill 154 hours per each two-week pay period regardless of actual hours worked. According to Foreman, the government was unaware that it was AECOM's policy and practice to pre-sign timesheets and bill 154 hours for each pay period because AECOM covered up these practices.

The Complaint also asserts that AECOM billed for work performed by unqualified and uncertified employees in violation of its obligations under the

MOSC-A Contract. In order to conceal its non-compliance, AECOM created and utilized its own certifications. AECOM also provided unvetted and uncertified employees with access to U.S. government systems in violation of regulations, statutes, and policies governing security clearances.

In 2012, AECOM performed an internal timekeeping review to assess whether its timekeeping practices complied with its obligations under the MOSC-A Contract. AECOM estimated that it owed the government more than $140 million because of its improper labor billing practices between 2010 and 2014 and calculated a possible settlement amount of $43 million.

Although AECOM allegedly had an obligation to repay or remit more than $140 million in overpayments from the government, AECOM did not notify the government of its findings. Instead, it engaged in a historical timesheet corrections process in an effort to rectify its timesheet deficiencies. Foreman alleges that this corrections process was eventually halted, demonstrating that AECOM only undertook it so that it would be able to "claim that [the timesheet deficiencies] [we]re 'technical errors,' but that the underlying time was legitimate and billable." A.368 ¶ 110.

2. *The Man-Hour Utilization Allegations*

As noted, AECOM was expected to meet an 85 percent MHU rate and was required to report its MHU rate to the government on a monthly basis. The MHU rate served as a critical metric that the Army could review to determine prospectively whether and where to reduce staff.

AECOM's MHU rate was consistently and significantly below 85 percent. In 2012, for example, AECOM received a corrective action request from the Defense Contract Management Agency ("DCMA"), which reported that AECOM's MHU rate was 26 percent. AECOM subsequently engaged in discussions with the Army about the methodology for calculating the MHU rate, and it was agreed that AECOM would report the MHU rate on a monthly basis. Nevertheless, AECOM continued to fall short of the 85 percent requirement.

Foreman alleges that, in order to conceal its failure to meet the requisite MHU rate, AECOM devised its own format for reporting its MHU rate. Instead of doing so through the SAMS-E system as required, it compiled a non-standard report. By reporting outside the SAMS system, AECOM allegedly "avoided having a direct tie to actual hours in the system, allowing essentially made-up labor to be counted." A.400 ¶ 188. This also allowed for manipulation of the

MHU rate because "'indirect hours' not connected to a specific assignment" could be misapplied "to 'direct hours' of work performed." *Id.* Foreman alleges that the government was unaware that AECOM failed to use the SAMS-E system to track its MHU rate as required.

According to Foreman, it was in AECOM's interest to overstate its MHU rate because this "allowed it to keep its workforce high, increasing costs and corresponding profits on th[e] [MOSC-A] cost-plus contract." A.401 ¶ 190.

### 3. *The Property Allegations*

Foreman also alleges that AECOM failed to properly track and account for parts and equipment ordered during the performance of the MOSC-A Contract. While AECOM was required to order parts through the SAMS-E system in order to minimize duplicative ordering or ordering of parts that were already available, employees instead frequently ordered items through unauthorized "parts-only" work orders. Parts-only work orders bypass checks and balances built into the procurement system to avoid excessive ordering and ensure accountability for labor charges and parts, and, as a result, do not provide for proper tracking of equipment. For example, if tires were properly ordered through the SAMS-E system pursuant to an established vehicle program or work

order, the system would trigger an alert if the number of tires did not match the number of trucks for which they were destined or the expected tire usage. A parts-only work order, by contrast, could not be monitored in this fashion because "it would not tie" to an actual work order. A.414. ¶ 216. Foreman alleges that AECOM intentionally utilized parts-only work orders to bypass the SAMS-E system. And an internal AECOM memorandum identified over 6,000 parts, worth over $16 million, that had incomplete records in the SAMS-E system.

In addition, AECOM employees frequently purchased redundant parts, sometimes buying the same items twice by ordering goods through the government supply system while simultaneously purchasing them on the commercial market. For example, in an August 28, 2016, email, an AECOM supervisor explained that in one work order, nine parts were ordered when only four were needed and noted that this was a "systematic issue that has happened since the inception according to system log[]s, oil amounts, parts ordered and not needed etc. leading to some of the excess parts issues we have run across." A.421 ¶ 234.

AECOM also failed to track and return to the Army "recoverables," which are items removed from vehicles and other equipment. Because the SAMS-E system was not being properly used, work order records were not "created, closed or audited, resulting in recoverable items not being returned or duplicates not being controlled." A.425-26 ¶ 243. AECOM allegedly concealed its failure to properly track and turn in recoverables by not sending mandatory daily interfaces to the Army's Logistical Information Warehouse – a database intended to allow the Army to order parts. According to an internal AECOM memorandum, although AECOM was aware of this problem, it did not inform the government because it "did not intend fraud, and . . . the risk of the issue being brought to light was minimal or not at all." A.426 ¶ 246.

In a 2015 internal corrective action report, AECOM characterized its failure to properly turn in recoverable items through government systems as "Severity: Major," and noted that it could result in "failure of proper credit" to the government and "significant liability" to AECOM. A.427 ¶ 252. A March 2015 system query identified $15-16 million in improper or undocumented recoverables. Foreman alleges that AECOM subsequently instructed a supervisor to remove records regarding recoverables from its system.

*Procedural History*

On March 16, 2016, Foreman filed a *qui tam*[6] complaint alleging that AECOM submitted false and fraudulent claims to the government for payment in violation of the FCA. Foreman's original complaint remained under seal while the government investigated and decided whether to intervene. In November 2018, while the government's investigation was pending, Foreman filed a second amended complaint.

Over the course of the government's investigation, AECOM turned over many documents to the government. On May 28, 2019, the government submitted a letter to the district court, notifying the court that it did not intend to intervene in the action. On July 29, 2019, prior to the onset of formal discovery, AECOM completed its production to Foreman of all the documents that it had turned over to the government during the investigation.

---

[6] "[The False Claims Act] creates a right of action under which private parties may, on behalf of the federal government, bring lawsuits alleging fraud. The actions go by the hoary Latin term '*qui tam*' (short for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, meaning 'who as well for the king as for himself sues in this matter[)].'" *United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 10 F.4th 765, 772 (7th Cir. 2021) (internal citation omitted) (quoting Bryan A. Garner, ed., BLACK'S LAW DICTIONARY at 1444 (10th ed. 2014)). "The party seeking to represent the government's interest is called a 'relator.'" *Id.*

In August 2019, AECOM filed a pre-motion letter outlining the bases for its planned motion to dismiss Foreman's second amended complaint. After reviewing a draft of AECOM's pre-motion letter, which AECOM shared with Foreman in an effort to narrow the issues in dispute, AECOM consented to Foreman's amendment of the second amended complaint to revise the allegations relating to subject-matter jurisdiction, personal jurisdiction, and venue. Foreman did not otherwise seek to amend the allegations in the second amended complaint. The district court granted Foreman leave to amend, and he filed the Complaint in September 2019.

In the Complaint, Foreman asserts that: (1) AECOM knowingly submitted false or fraudulent claims to the government in violation of 31 U.S.C. § 3729(a)(1)(A); (2) AECOM knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the government in violation of 31 U.S.C. § 3279(a)(1)(B); (3) AECOM had possession, custody or control of property to be used by or on behalf of the government and knowingly delivered or caused to be delivered less than the proper amount of such property to the government in violation of 31 U.S.C. § 3279(a)(1)(D); (4) AECOM knowingly made, used, or caused to be made or used, a false record or

statement material to an obligation to pay or transmit property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property to the government, in violation of 31 U.S.C. § 3279(a)(1)(G); (5) AECOM fraudulently induced the government into entering into and extending the MOSC-A Contract in violation of 31 U.S.C. § 3729(a)(1)(A); and (6) AECOM unlawfully retaliated against Foreman, in violation of 31 U.S.C. § 3730(h), by discharging him for engaging in protected activities.

On October 30, 2019, AECOM moved to dismiss the Complaint. It argued that several of the claims should be dismissed pursuant to the public disclosure bar. In the alternative, AECOM contended that all of Foreman's claims should be dismissed for failure to state a claim.

On April 13, 2020, the district court granted AECOM's motion to dismiss. *United States ex rel. Foreman*, 454 F. Supp. 3d at 258. Although the district court concluded that the public disclosure bar did not apply, *id.* at 260-64, the court nevertheless dismissed Foreman's false claims under § 3729(a)(1)(A)-(B), which were tied to his labor billing, MHU rate, and property allegations, because it concluded that AECOM's allegedly false certifications were not material to the

government's payment decision, *id.* at 264-66. The district court reasoned that AECOM's false representations regarding its labor billing practices, MHU rate, and property tracking were not material because the government was aware of AECOM's violations of the MOSC-A Contract, but nevertheless continued to pay AECOM and extend the contract multiple times. *Id.* at 265-66. In reaching this conclusion, the district court relied on documents outside of the Complaint, including a September 2014 evaluation conducted by the Defense Contract Audit Agency ("DCAA"), a July 2012 corrective action plan issued by the DCMA, an October 2012 corrective action request issued by the DCMA, and numerous work order documents, including an Army memorandum. *See id.* The district court found it appropriate to consider these documents because it concluded that they were either incorporated by reference into, or integral to, the complaint. *Id.* at 265 n.2.

The district court also dismissed Foreman's conversion claim, reverse false claim, and retaliation claim. *Id.* at 267-70. The district court dismissed Foreman's 31 U.S.C. § 3729(a)(1)(D) conversion claim because the allegations in the Complaint "d[id] not identify any specific excess or recoverable item or other property that defendants possessed but failed to deliver to the government." *Id.*

at 268.  The court also dismissed his 31 U.S.C. § 3729(a)(1)(G) reverse false claims, because the claims were "based on the same labor billing and property violations underlying the direct false claims, which allege that defendants submitted false certifications in their invoices requesting payment and retained those payments." *Id*.  The district court explained that the Complaint did not identify a "separate obligation to return overpayments or excess property to the government" and concluded that the allegations – which "essentially boil[ed] down" to the claim that AECOM was receiving payment on false claims and thus retaining government funds to which it was not entitled – did not state viable reverse false claims.  *Id.* at 269.  Lastly, the district court dismissed Foreman's retaliation claim because it found that he had failed to adequately plead that he engaged in protected conduct or that the defendants were aware of any protected activity. *Id.* at 270.

Although the district court indicated that the dismissal of the Complaint "reflect[ed] the underlying invalidity of the merits of the claims, such as the government's continued disregard of defendants' shortfalls as being insufficiently serious or consequential ('material') to justify either litigation or

22

severance of the relationship," it granted Foreman "leave to move for leave to serve a fourth amended complaint." *Id.*

Following the district court's decision, Foreman moved for reconsideration. On May 19, 2020, the district court denied the motion. On June 5, 2020, the clerk entered judgment for AECOM. Foreman then submitted a letter requesting vacatur of the clerk's judgment so that he could move for leave to amend. The district court denied Foreman's request, explaining that – following its Opinion and Order granting AECOM's motion to dismiss – Foreman had seven weeks to move for leave to amend and yet had failed to do so.

On July 3, 2020, Foreman filed a motion to alter or amend the judgment and requested leave to file a fourth amended complaint. Foreman argued that leave to amend should be freely granted under Rule 15(a), that he did not unduly delay in seeking leave to amend, that he had not acted in bad faith, that he had not repeatedly failed to cure deficiencies by amendments previously allowed, and that the proposed amendments would not be futile. He argued that the proposed amendments satisfied the FCA's materiality requirement. He further argued that his express false claims, including the claim for fraudulent inducement, did not need to pass a materiality test to be viable. He similarly

argued that his conversion and reverse false claims would not be futile because the proposed fourth amended complaint identified both specific excess or recoverable property that AECOM possessed but failed to return to the government and a separate obligation to return overpayments and excess property to the government.

On August 13, 2020, the district court denied Foreman's motion. *United States ex rel. Foreman v. AECOM*, No. 16 CIV. 1960 (LLS), 2020 WL 4719096, at *1 (S.D.N.Y. Aug. 13, 2020). It reasoned that it was not appropriate to grant relief from judgment because Foreman's proposed further amendments "d[id] not remedy the deficiencies of the third amended complaint and would be futile." *Id.* at *2. With respect to Foreman's false claims under § 3729(a)(1)(A)-(B), the district court acknowledged that the proposed fourth amended complaint contained additional allegations that AECOM submitted inaccurate timesheets, failed to accurately report its MHU rate, failed to properly track recoverable items, and gave advance notice to employees of audits, but explained that the same allegations formed the basis of the claims in the Complaint which the court had found to be immaterial. *Id.* at *3. Moreover, while the district court took note of Foreman's additional allegations that the government was unaware of the

24

scope of AECOM's improper labor billing practices, it found that a September 2014 DCAA report demonstrated that the government had actual knowledge of these alleged violations of the MOSC-A Contract.  *Id.*  The court also rejected Foreman's argument that express claims do not need to be material, concluding that this argument was contrary to our holding in *Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 107 (2d Cir. 2017).  *Id.* at *3 n.1.

The district court similarly concluded that Foreman's amendment to the conversion and false reverse claims would be futile.  Regarding Foreman's conversion claim, the court decided that the fourth amended complaint still failed to "identify any specific excess or recoverable item or other property that defendants possessed but failed to deliver to the government."  *Id.* at *4.  With respect to Foreman's reverse false claim, the district court found that the fourth amended complaint's "new allegation that defendants have a separate obligation to return overpayments and excess property to the government does not cure the deficiency . . . [that] the reverse false claim is based on the same labor billing and property violations underlying the direct false claims, which were dismissed due to a lack of materiality."  *Id.* (internal quotation marks omitted).

Foreman filed a notice of appeal.

**DISCUSSION**

## I. Standard of Review

"This Court review[s] *de novo* the grant of a motion to dismiss under Rule 12(b)(6), accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor." *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 176 (2d Cir. 2019) (internal quotation marks omitted). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 176 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II. False Claims

On appeal, Foreman argues that the district court erred in dismissing his false claims brought pursuant to 31 U.S.C. § 3729(a)(1)(A) because it (1) improperly imported a materiality requirement onto Foreman's express false claims, factually false claims, and fraudulent inducement claims; (2) improperly relied on extrinsic evidence outside of the Complaint in conducting its materiality analysis; and (3) incorrectly dismissed the claims for lack of materiality. For the reasons explained below, we agree that the district court improperly relied on extrinsic evidence and erroneously dismissed Foreman's

false claims premised on the labor billing allegations.  We conclude, however, that the district court correctly dismissed Foreman's other claims premised on the MHU rate and property tracking allegations.

### A.  Applicability of Materiality Requirement

Foreman argues first that the district court erred in dismissing all of his false claims because the Supreme Court's decision in *Escobar* only establishes a materiality requirement for "implied" false claims.  According to Foreman, *Escobar*'s materiality requirement therefore does not apply to his "express" false claims, including his fraudulent inducement claim, which he contends is based on AECOM's express – rather than implied – false representations to the government, and his "factually false" claims.[7]  This argument is without merit.

---

[7] "A successful FCA claim generally occurs in one of three forms":  (1) a factually false claim; (2) a legally false claim under an express false certification theory; and (3) a legally false claim under an implied certification theory.  *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011); *see United States ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 125 (D. Mass. 2011).

A factually false claim is one that "is untrue on its face," such as a claim that "include[s] an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 154.  Legally false claims "do not involve information that is false on its own terms, but instead rest[] on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *Id.* (internal quotation marks omitted).  "A legally false claim, also known as a 'false certification,' can be either 'express' or 'implied.'"  *Id.*  "An express false certification occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not

In *Escobar*, the plaintiffs filed a *qui tam* suit asserting claims under the FCA pursuant to 31 U.S.C. § 3729(a)(1)(A). *Escobar*, 136 S. Ct. at 1993. The plaintiffs sought to hold the defendant liable under an implied false certification theory of liability. *Id.* at 1993, 1995. The Supreme Court granted *certiorari* to decide whether an implied false certification theory could provide a viable basis for liability and to "clarify some of the circumstances in which the False Claims Act imposes liability." *Id.* at 1995. In concluding that the implied false certification theory could provide a basis for liability, the Court looked to the language of 31 U.S.C. § 3279(a)(1)(A), which "imposes civil liability on 'any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.'" *Id.* at 1999 (quoting 31 U.S.C. § 3279(a)(1)(A)). When interpreting "what makes a claim false or fraudulent," the Court reasoned that

---

complied." *Id.* An "implied" false certification claim arises where the defendant submits a claim for payment, impliedly certifying compliance with conditions of payment while omitting its violations of statutory, regulatory, or contractual requirements, and these omissions render the representations misleading. *See Escobar*, 136 S. Ct. at 1995 ("[T]he implied false certification theory can be a basis for liability . . . when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement . . . [and] the omission renders those representations misleading."); *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 154 ("[A]n implied false certification occurs when the claimant makes no affirmative representation but fails to comply with a contractual or regulatory provision where certification was a prerequisite to the government action sought." (internal quotation marks omitted)).

28

Congress intended to incorporate "the well-settled meaning of the common-law terms it uses," and concluded that the use of the term "fraudulent" demonstrated Congress's intent to incorporate the common-law meaning of fraud. *Id.* "Because common-law fraud has long encompassed certain misrepresentations by omission," the Supreme Court held that "'false or fraudulent claims' include more than just claims containing express falsehoods." *Id.* An implied certification theory may therefore provide a basis for liability where the claim for payment "makes specific representations about the goods or services provided" and the "defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001. The Court further held that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be *material* to the Government's payment decision in order to be actionable under the False Claims Act." *Id.* at 1996 (emphasis added).

Although *Escobar* involved an implied false certification claim, nothing in the opinion suggests that its materiality requirement was intended to be limited to that specific theory of liability. To the contrary, the Court looked to the language of § 3279(a)(1)(A) generally and concluded that it incorporates a

common-law materiality requirement and that, absent such a showing, a § 3279(a)(1)(A) claim is not actionable. *See Escobar*, 136 S. Ct. at 1996, 1999-2002. Moreover, we have repeatedly read *Escobar* to impose a materiality requirement on all claims brought under § 3279(a)(1)(A), including express false claims and fraudulent inducement claims. *See Bishop*, 870 F.3d at 106-07 ("[A]lthough *Escobar* was an implied false certification case, it also abrogated *Mikes*'s particularity requirement for express false certification claims. . . . In place of *Mikes*'s requirements, the *Escobar* Court set out a 'familiar and rigorous' materiality standard." (quoting *Escobar*, 136 S. Ct. at 2004 n.6)); *United States v. Strock*, 982 F.3d 51, 60-65 (2d Cir. 2020) (applying *Escobar*'s materiality requirement to fraudulent inducement claim).[8]

We therefore conclude that *Escobar* imposes a materiality requirement on all of Foreman's § 3279(a)(1)(A) claims.

---

[8] Foreman argues that our decisions in *Bishop* and *Strock* are inconsistent with our prior decision in *United States ex rel. Kirk v. Schindler Elevator Corp.* ("*Kirk*"), 601 F.3d 94 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011), and that *Bishop* and *Strock* cannot overrule our prior precedent in *Kirk*. But *Kirk* was decided before *Escobar* and employed the analysis set forth in *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), which was abrogated by *Escobar*. *See Kirk*, 601 F.3d at 113. *Kirk* is therefore no longer good law and *Bishop* properly overruled *Mikes* and its progeny based on *Escobar*. *See Bishop*, 870 F.3d at 107 (overruling *Mikes* because "a panel of this Court may overrule a precedent when 'an intervening Supreme Court decision [(here, *Escobar*)] casts doubt on the prior ruling'").

### B. Consideration of Material Extraneous to the Complaint

#### 1. Applicable Law

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). For a document to be considered integral to the complaint, the plaintiff must "rel[y] on the terms and effect of a document in drafting the complaint . . . mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). And "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and it must be clear that "there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco*, 622 F.3d at 111 (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

Where a district court considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint, the district court, to decide the issue on the merits, must convert the motion into one for summary judgment. *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) ("'[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'" (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)); *see also* Fed. R. Civ. P. 12(d). This requirement "deters trial courts from engaging in factfinding when ruling on a motion to dismiss and ensures that when a trial judge considers evidence [outside] the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). A district court therefore "errs when it consider[s] affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." *Friedl*, 210 F.3d at 83-84

(internal quotation marks and citations omitted).

2.  *Application*

Foreman argues that, in conducting its materiality analysis, the district court improperly relied on the following documents which were outside of the complaint:  (1) a September 2014 audit report issued by the DCAA (the "September 2014 DCAA Report"), which reported on AECOM's labor billing practices to the Department of Defense; and (2) documents related to Work Order 6HN26S603914, including an Army memorandum.  AECOM argues that the district court properly considered the September 2014 DCAA report because it was integral to the complaint, and that the work order-related documents were incorporated by reference because the complaint references and quotes from Work Order 6HN26S603914.

We turn first to the September 2014 DCAA Report, which the district court considered in assessing the materiality of the alleged labor billing violations of the MOSC-A Contract.  *See United States ex rel. Foreman*, 454 F. Supp. 3d at 265. AECOM concedes, as it must, that this report was not referenced anywhere in the Complaint, but argues that it was nevertheless proper for the district court to consider because it was integral to the Complaint.  It was, AECOM urges,

integral to the "plaintiff's ability to pursue his cause of action," even though he omitted it from the Complaint. Appellees' Br. 38 (quotation marks omitted). According to AECOM, the report establishes that the government had knowledge of the alleged violations of the MOSC-A Contract underlying Foreman's labor billing claims. Because the government's knowledge of these alleged violations is critical to determining whether AECOM's allegedly false certifications were material to the government's payment decision (and whether Foreman's claims are therefore actionable), *see Escobar*, 136 S. Ct. at 2003, AECOM contends that the report is integral to the complaint. AECOM also points out that, throughout the Complaint, Foreman references DCAA audits, and argues that, "[g]iven the centrality of DCAA's labor billing audit process to Foreman's complaint," the September 2014 DCAA Report was integral to the Complaint. Appellees' Br. 39. AECOM emphasizes that Foreman had notice of the report because on December 21, 2018, and July 29, 2019, in the wake of the government's investigation into Foreman's claims (and prior to the filing of the Complaint), it produced the report to Foreman. We find these arguments unpersuasive.

As explained above, a document may be considered "integral" to the complaint in a narrow set of circumstances, where the plaintiff relies heavily on

the document's terms and effect in pleading his claims and there is no serious dispute as to the document's authenticity. *See DiFolco*, 622 F.3d at 111. "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Glob. Network Commc'ns, Inc.*, 458 F.3d at 157. Accordingly, we have recognized the applicability of this exception where the documents consisted of emails that were part of a negotiation exchange that the plaintiff identified as the basis for its good faith and fair dealing claim, *see L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011), or consisted of contracts referenced in the complaint which were essential to the claims, *see Chambers*, 282 F.3d at 153 n.4. In securities fraud cases, we have similarly found it appropriate to consider documents filed with the Securities and Exchange Commission ("SEC") when they form the basis for the allegations in the complaint. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a

Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed.").

In contrast to other documents that we have found to be integral to a complaint, the September 2014 DCAA Report was not alluded to, and did not form the basis for, the allegations or claims in the Complaint. While AECOM did produce the September 2014 DCAA Report to Foreman prior to the filing of the Complaint, the parties agreed that the amendments in the Complaint would be limited to jurisdiction and venue and Foreman did not rely on the report to support, or form the basis for, the allegations in the Complaint. The fact that the September 2014 DCAA Report demonstrates the government's knowledge of some of the alleged MOSC-A Contract violations underlying Foreman's claims (and therefore undermines the strength of Foreman's claims) does not render it integral to the Complaint. If all that is required to render a document integral to the complaint is that it be favorable to the defendant, possibly thwarting the plaintiff's claims, it would be difficult to imagine a document that could not be considered on a motion to dismiss pursuant to the integral-to-the-complaint exception.

Moreover, while the Complaint alleges generally that AECOM was subject

to periodic audits by the DCAA and that AECOM sought to conceal its alleged violations of the MOSC-A Contract from DCAA personnel conducting the audits, these allegations do not render the audit process, in and of itself, integral to the Complaint such that any document related to the DCAA audit process is integral. If we were to accept AECOM's argument that these general allegations rendered the audit process (and every document relating to it) integral to the Complaint, again, the exception would swallow the rule. AECOM's approach is inconsistent with the law and our directive that the conversion-to-summary-judgment requirement be "strictly enforced whenever a district court considers extra-pleading material in ruling on a motion to dismiss." *Chambers*, 282 F.3d at 154 (internal quotation marks omitted). We therefore conclude that the district court erred in considering the September 2014 DCAA Report. *Cf. Strock*, 982 F.3d at 63 ("[T]he complaint does not rely on the GAO report at all, so it is not 'integral.'").

We next turn to the documents related to Work Order 6HN26S603914, which the district court relied upon in its consideration of the materiality of the alleged property tracking violations of the MOSC-A Contract. *See United States ex rel. Foreman*, 454 F. Supp. 3d at 266. The district court could consider Work

Order 6HN26S603914 itself because paragraph 218 of the Complaint explicitly references and quotes from it to support Foreman's property allegations. But the district court went beyond the work order to consider various documents related to it that AECOM submitted as Exhibit 7 in connection with its motion to dismiss. Exhibit 7 includes (1) two documents entitled "Maintenance Request," which reference Work Order 6HN26S603914; (2) an Army memorandum, which similarly discusses Work Order 6HN26S603914 and the fact that it was a parts-only order; (3) a document entitled "Equipment Inspection and Maintenance Worksheet," which also references Work Order 6HN26S603914; (4) two Work Order Detail documents for Work Order 6HN26S603914; and (5) a document entitled "Workload Accounting Daily Status Sheet," which also mentions that Work Order 6HN26S603914 was a parts-only work order. A.643-51. The Army memorandum regarding Work Order 6HN26S603914 is clearly distinct from the work order and was not incorporated by reference into the Complaint simply because it references Work Order 6HN26S603914. And it is unclear what the other documents are or whether all or one of those documents reflect a true and correct copy of Work Order 6HN26S603914. Indeed, in connection with its motion to dismiss, AECOM filed an affirmation describing the documents in

Exhibit 7 as "work order documents that *appear to relate to* 'WO 6HN26S603914,'" A.515 ¶ 8 (emphasis added), raising questions as to the authenticity and status of these documents. In light of possible disputes as to the answers to these questions, it was error for the district court to consider the work order-related documents in resolving AECOM's motion to dismiss. *See Faulkner*, 463 F.3d at 134 ("[E]ven if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.").

For the foregoing reasons, the district court erred in relying on the September 2014 DCAA Report and the documents related to Work Order 6HN26S603914 without first converting the motion to dismiss into a motion for summary judgment.

### C. Materiality Analysis

As noted, to be actionable under the FCA, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 136 S. Ct. at 2002. A plaintiff must therefore plead sufficient facts to plausibly allege materiality. *See id.* at 2004 n.6. Materiality

must also "be pleaded with particularity under Rule 9(b)." *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 87 (2d Cir. 2017) (summary order). The materiality standard "is demanding," inasmuch as it serves to protect the FCA from being transformed into "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003.

The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In assessing materiality, we "'look[] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation' . . . rather than superficial designations." *Strock*, 982 F.3d at 59 (quoting *Escobar*, 136 S. Ct. at 2002). A misrepresentation therefore "cannot be deemed material *merely* because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 136 S. Ct. at 2003 (emphasis added). "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* In addition, materiality "cannot be found where noncompliance is minor or insubstantial." *Id.* Instead, when evaluating materiality,

40

the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04 (footnote omitted). Accordingly, under *Escobar*, relevant factors in

evaluating materiality include: (1) whether the government expressly designates

compliance with a particular statutory, regulatory, or contractual requirement as

a condition of payment; (2) the government's response to noncompliance with

the relevant contractual, statutory, or regulatory provision; and (3) whether the

defendants' alleged noncompliance was "minor or insubstantial." *Id.* at 2003-04;

*Strock*, 982 F.3d at 59-65 (analyzing materiality under these three "*Escobar*

factors"). "No one factor is dispositive, and our inquiry is holistic." *United States*

*ex rel Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019); *see also Strock*,

982 F.3d at 59-65.

### 1. *Express Condition of Payment*

"The first factor that *Escobar* identifies as relevant to materiality is whether

41

the government 'expressly identif[ied] a provision as a condition of payment.'"

*Strock*, 982 F.3d at 62 (quoting *Escobar*, 136 S. Ct. at 2003). Foreman argues that

this factor weighs in favor of materiality because the MOSC-A Contract

"incorporates by reference, and requires compliance with, the Performance Work

Statements . . . and numerous Federal Acquisition Regulations . . . violated by

AECOM." Appellant's Reply Br. 3. And FAR 52.216-7 specifies that final

payment by the government was expressly conditioned "upon the Contractor's

compliance with all terms of this contract." *Id.*; 48 C.F.R. § 52.216-7(h)(1) ("Upon

approval of a completion invoice or voucher submitted by the Contractor in

accordance with paragraph (d)(5) of this clause, and upon the Contractor's

compliance with all terms of this contract, the Government shall promptly pay

any balance of allowable costs and that part of the fee (if any) not previously

paid."). AECOM counters that this factor weighs against a finding of materiality

because Foreman fails to identify any provision that specifically identifies any of

the contractual or regulatory requirements that AECOM allegedly violated as an

express condition of payment. AECOM further argues that interpreting FAR

52.216-7's general statement that the government's final payment is contingent on

compliance with all the terms of the MOSC-A Contract (which incorporates by

reference all of the Performance Work Statements ("PWS") and FAR) is fundamentally flawed because, under that logic, "every single PWS, and thousands of FAR provisions would *each* constitute an express condition of payment and thus satisfy *Escobar*'s first factor." Appellees' Br. 25 (emphasis in original) (internal quotation marks omitted).

We think that AECOM has the better of the argument and that this factor, at most, weighs neutrally in the materiality analysis. As AECOM points out, there are no provisions in the contract or in the federal regulations specifically designating any of the contractual or regulatory requirements that Foreman alleges AECOM violated as an express condition of payment. Instead, there is only a blanket statement in FAR 52.216-7 that final payment is contingent on a contractor's compliance with "all terms" of the contract, which Foreman alleges includes all the PWS and FAR obligations because those were incorporated by reference into the MOSC-A Contract.

Although the Supreme Court in *Escobar* indicated that the government's decision to expressly identify a provision as a condition of payment is relevant, it emphasized that this factor is not "automatically dispositive." *Escobar*, 136 S. Ct. at 2003. The *Escobar* Court also noted that if the government were to "designat[e]

every legal requirement an express condition of payment," it would make it difficult for "would-be defendants [to] anticipate and prioritize compliance obligations" because "billing parties are often subject to thousands of complex statutory and regulatory provisions." *Id.* at 2002. While the Court did not suggest that such a designation would necessarily weigh against a finding of materiality, its commentary on the subject suggests that this factor would likely be entitled to less weight where, as here, the government designates every contractual and regulatory requirement as a condition of payment. Indeed, where the government designates every regulatory and contractual requirement – as opposed to a select few – as conditions of payment, a reasonable person has less reason to know whether a violation of such a requirement will actually be treated as a condition of payment, which would seem to weigh against materiality. *See Escobar*, 136 S. Ct. at 2002-03.

For similar reasons, Foreman's reliance on government manuals and guidance, as well as internal AECOM documents describing the MHU rate, inventory management, and labor billing practices as "critical metrics" or otherwise important, does not weigh heavily in favor of a finding of materiality. For example, Foreman points out that the government designated the MHU rate

requirement as well as the "importance of inventory controls and accuracy" as "critical metrics," A.394 ¶ 169, A.410 ¶ 206, and that government manuals and AECOM internal documents emphasized that timekeeping procedures and "accurate recording" of labor were of "utmost concern" and "significant," A.347-48 ¶ 64. Such pronouncements can, under certain circumstances, support an inference that a given contractual or regulatory requirement is material to the government's payment decision. *See United States v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 836 n.9 (6th Cir. 2018). However, generic and routine appeals to the importance of a multitude of regulatory requirements or broad goals, such as accurate recordkeeping, do not put a contractor on notice of the importance of a given requirement to the government's payment decision, particularly where, as here, the government has not expressly designated compliance with that requirement as a condition of payment.

We therefore find that this factor weighs neutrally or has, at most, only limited weight in the analysis of Foreman's materiality pleading.

### 2. *The Government's Response*

The second materiality factor "concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision."

*Strock*, 982 F.3d at 62. "*Escobar* directs examination of the government's reaction to noncompliance both 'in the mine run of cases,' as well as in the 'particular' case at issue." *Id.* (quoting *Escobar*, 136 S. Ct. at 2003).

Turning first to the government's response to similar noncompliance in other cases, Foreman points out that the Complaint alleges that the government initiated civil and criminal enforcement actions against Northrop Grumman Systems Corporation ("NGSC") for engaging in timesheet fraud similar to the kind allegedly perpetrated by AECOM. The Complaint alleges that NGSC agreed to pay $27.45 million to settle civil allegations that it violated the FCA by overstating the number of hours its employees worked in connection with contracts with the United States Air Force, and agreed to forfeit $4.2 million in a separate agreement to resolve a criminal investigation into fraudulent billing on another government contract. NGSC employees charged 12 to 13.5 hours per day, seven days a week, despite the fact that employees did not work those hours and, in fact, frequently engaged in leisure activities. As a result, NGSC employees were paid thousands of dollars that they did not earn and NGSC overbilled the United States by more than $5 million at one site alone.

AECOM contends that these allegations have little relevance to the materiality analysis here because the federal government initiated an enforcement action against NGSC based on a very different set of facts. But accepting the allegations in the Complaint as true and drawing all inferences in Foreman's favor as we must, the facts underlying the action against NGSC appear reasonably similar to the labor billing allegations in the Complaint. Similar to NGSC, Foreman alleges that AECOM had a policy of billing 11.5 hours per day, 154 hours per each two-week pay period, regardless of actual hours worked, and that an internal AECOM memo estimated that AECOM is liable for $144,872,000 related to its timesheet fraud.

As we have explained, however, "*Escobar* indirectly indicates that allegations of post hoc prosecutions or other enforcement actions do not carry the same probative weight as allegations of nonpayment":

> *Escobar* emphasized that the materiality standard is demanding, and that the government may not manufacture materiality by alleging it had an option not to pay after the fact. Allowing the government to rely on post hoc enforcement efforts to satisfy the materiality requirement would allow the government to engage in just such materiality manufacturing, and at relatively low cost. Unlike mid-contract refusals to pay, engaging in post hoc enforcement does not require the government to risk delay of a project. Instead, the government needs risk only the cost of litigation, a risk that is mitigated by an opportunity to recoup the cost of a completed project. Thus, while purely post hoc enforcement actions can carry some weight in

> a materiality analysis, they are less probative than allegations that the government actually refuses to make payments once it determines that the [regulatory or contractual] condition has been violated.

*Strock*, 982 F.3d at 63-64 (internal quotation marks and citations omitted).

Accordingly, Foreman's allegations that the government initiated enforcement actions against a different contractor based on labor billing allegations similar to those in the Complaint are "at best only neutral with regard to a finding of materiality, particularly in light of the complaint's failure to allege even a single instance in which the government actually refused to pay a claim or terminated an existing contract based on a false [labor billing] representation." *Id.* at 64.

With respect to the government's response to the violations alleged here, "though not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017).  As noted, "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Escobar*, 136 S. Ct. at 2003.  Foreman concedes that the government has repeatedly renewed and extended the MOSC-A, with the majority of amendments "directed

48

to increased funding," A.325 ¶ 11, but argues that this has limited relevance to the materiality analysis because the "government did not have actual knowledge of the full scope of AECOM's alleged conduct," Appellant's Br. 43.

With respect to Foreman's allegations of MHU fraud, the district court relied on the allegations in the Complaint, as well as a July 2012 DCMA Corrective Action Plan and an October 2012 DCMA Corrective Action Request (both of which were incorporated by reference into the complaint), to conclude that the alleged MHU fraud was not material to the government's payment decision. *See United States ex rel. Foreman*, 454 F. Supp. 3d at 265. We agree with the district court.

The allegations in the Complaint, coupled with the reports incorporated by reference, demonstrate that the government had actual knowledge of AECOM's MHU rate violations of the MOSC-A Contract. The July 2012 DCMA Corrective Action Plan, for instance, highlighted a trend of deficiencies related to AECOM's failure to properly enter labor hours data into the SAMS-E system and noted that AECOM had failed to maintain "[a]ccurate Man Hour utilization . . . in SAMS theater wide." A.395 ¶ 173. And the October 2012 DCMA Corrective Action Request documented AECOM's MHU rate for the preceding month as 26

49

percent, which it described as "well under the required Utilization Rate of 85%."

A.396 ¶ 174.  The Complaint alleges that these corrective action reports resulted in open and ongoing discussions between AECOM and the Army about these concerns and how to address them.  The Complaint also references and quotes from a March 2010 report from the Department of Defense's Office of Inspector General (also incorporated by reference into the complaint), which reports that AECOM's failure to report reliable MHU rate data "resulted in DOD incurring costs for services that were not required."  A.395 ¶ 171.  The Complaint further alleges that in response to these findings, the Army prospectively mandated lower staffing levels where appropriate.  Despite its knowledge of, and investigation into, AECOM's violations of the MHU rate, the government still extended the MOSC-A Contract.  Moreover, the government did not disallow any charged costs; instead, it simply reduced staffing levels.  This provides powerful evidence that any misrepresentations AECOM made regarding its compliance with the MHU rate were not material to the government's payment decision.  *See, e.g., United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017) ("[W]e have the benefit of hindsight and should not ignore what actually occurred:  the DCAA investigated McBride's allegations and did

not disallow any charged costs. . . . This is very strong evidence that the requirements allegedly violated by the maintenance of inflated headcounts are not material." (internal quotation marks omitted)).

With respect to the allegations of AECOM's property tracking violations of the MOSC-A Contract, Foreman similarly references and quotes government investigations and audits as evidence in support of his claims. The Complaint alleges that "[i]n late 2011 and [the] first quarter of 2012," a DCMA property management system analysis concluded that "AC FIRST's system for control and accounting of Government Property at Bagram Airfield is INADEQUATE." A.430-31 ¶ 264. The analysis noted that AC First was considered "a high risk" and indicated that AECOM's failure to adequately account for government property "affect[ed] the ability of [Department of Defense] officials to rely upon information" produced by the property tracking systems. *Id.* The analysis further stated that "failure to record and manage inventory 'can lead to questions of reasonableness of consumption and verification that property was consumed only in the performance of the contract.'" A.431 ¶ 265. The analysis observed that AECOM "was 'unable to locate over half of the records in the sample.'" *Id.* The Complaint also alleges that many Army corrective action requests "discuss

these property concerns over at least a three year period." A.431 ¶ 267. In addition, the Complaint alleges that the Department of Defense's Inspector General Report documented "issues with tracking and accounting for property" in a 2015 performance audit of AECOM. A.409 ¶ 205 n.14. Indeed, the 2015 Inspector General Report – which is incorporated by reference into the Complaint – found that AC First "did not follow applicable Army regulations to initiate property loss investigations," "could not account for more than 400 pieces of nonrolling stock equipment" in February 2014, and did not adequately maintain property accountability. A.519. Yet, despite being aware of AECOM's violations of its obligations to properly account for and track government property, the government continued to extend and increase funding for the MOSC-A Contract. This provides further support for the conclusion that AECOM's property violations were not material to the government's payment decision.

Notwithstanding this evidence, Foreman argues that the government-response factor is not entitled to much weight, because there were "plausible explanations for why the government did not stop payment or terminate the MOSC-A [Contract], including the fact that . . . the MOSC-A was necessary to

support the war effort in Afghanistan." Appellant's Br. 22. In support of this argument, Foreman points to two recent cases from our sister Circuits, *United States ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 10 F.4th 765 (7th Cir. 2021) and *United States ex rel. Cimino v. International Business Machines Corp.*, 3 F.4th 412 (D.C. Cir. 2021), but these cases are distinguishable.

Notably, in both *Prose* and *Cimino*, the only evidence of the government's alleged knowledge of the contractual violations at issue stemmed from the relator's filing of the complaint. *See United States ex rel. Prose*, 10 F.4th at 777 ("Molina emphasized that the government not only continued paying it after Prose brought this case, but it also renewed its contract with Molina twice during that time."); *United States ex rel. Cimino*, 3 F.4th at 417 (noting that the IRS extended the license agreement in 2015, after Cimino filed his complaint against IBM). At the motion-to-dismiss stage, "[f]or pleading purposes," the *Prose* court found the defendants' "barebones assertion that the government was aware of all material facts . . . not enough to sweep away the elaborate facts that [the relators] furnished." *United States ex rel. Prose*, 10 F.4th at 777; *see also United States ex rel. Cimino*, 3 F.4th at 423.

Indeed, it makes sense not to place much weight on the government's response in the wake of such litigation because, prior to discovery and a formal court ruling, the relator's allegations are just that – allegations, and the government may not necessarily have knowledge of all the material facts.  At the pleadings stage, such generalized assertions that the government is aware of the relator's lawsuit but nevertheless continued payment under the contract will not suffice to overcome a relator's detailed allegations of materiality.  *See United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance.").

But here AECOM does not simply rest on bald assertions that the government continued to extend and pay claims under the MOSC-A Contract after Foreman brought suit.  Relying on reports incorporated by reference into the complaint, AECOM points to documentary evidence demonstrating that the government had actual knowledge of AECOM's failure to meet the MHU rate requirement and to properly track government property, and yet nevertheless not only continued to extend and pay claims under the MOSC-A Contract, but also never demanded repayment, disallowed any charged costs, or penalized

AECOM.  And the MOSC-A Contract is an option contract which requires the Army to evaluate whether to extend the contract based on AECOM's performance; notwithstanding its knowledge of AECOM's violations of the MHU rate and property tracking requirements, the Army repeatedly renewed and increased funding for the MOSC-A Contract.  This, as mentioned, is strong evidence that these contractual requirements were not material.  *See United States ex rel. McBride*, 848 F.3d at 1034 (concluding that the government's response provided strong evidence of lack of materiality where the DCAA investigated the relator's allegations "and did not disallow any charged costs").

There may be circumstances where the government's payment of a claim or failure to terminate a contract despite knowledge of certain alleged contractual violations will not be particularly probative of lack of materiality.  *See, e.g., United States ex rel. Prose*, 10 F.4th at 777 ("Many things could explain the government's continued contracting with Molina.  It may have expected to purge the underserved NF enrollees from the books; it may have needed time to work out a way not to prejudice Medicaid recipients who had nothing to do with this problem."); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003) ("[W]e can foresee instances in which a government

entity might choose to continue funding the contract despite earlier wrongdoing by the contractor.  For example, the contract might be so advantageous to the government that the particular governmental entity would rather not contest the false statement, even if it became aware of the false statement before the subcontractor began its work.").  But the plaintiff must plausibly plead facts to support such possible alternative explanations in the complaint (and at a later stage of litigation, must support these allegations with evidence).  *See United States ex rel. Mei Ling v. City of Los Angeles*, 389 F. Supp. 3d 744, 761 (C.D. Cal. 2019) ("Because continued payments are relevant only to the extent that they are probative of immateriality, the Government may still maintain an FCA claim if it can muster allegations, taken as true, that explain why continued payments are not probative of immateriality in the circumstances presented by a specific case.").  Foreman failed to do so here.

Finally, with respect to Foreman's labor billing allegations, the district court relied upon the September 2014 DCAA Report to conclude that the government had actual knowledge of AECOM's labor billing violations.  *See United States ex rel. Foreman*, 454 F. Supp. 3d at 265.  But, as discussed above, we conclude that it was error for the district court to consider the September 2014

DCAA Report in connection with AECOM's motion to dismiss.  We therefore cannot conclude, for the purpose of determining whether Foreman sufficiently pled materiality, that the government had actual knowledge of AECOM's alleged labor billing violations and continued to pay AECOM's claims notwithstanding them.  Rather, "the parties dispute exactly what the government knew and when, calling into question its 'actual knowledge.'"  *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 906-07 (9th Cir. 2017).  Indeed, Foreman alleges that AECOM:  required employees to bill 11.5 hours per day, 154 hours per each two-week period, regardless of actual hours worked; estimated that it might be liable to the government for more than $144 million resulting from improper labor billing and timesheet violations; failed to notify the government of these timesheet violations; and engaged in a cover up to conceal these violations from the government.  In the absence of any evidence suggesting that the government regularly pays this type of claim despite actual knowledge that these requirements were violated, Foreman "allege[s] more than the mere possibility that the government would be entitled to refuse payment if it were aware of the violations, sufficiently pleading materiality at this stage of the case." *United States ex rel. Campie*, 862 F.3d at 907 (internal citation omitted).

### 3.  *The Substantiality Factor*

In evaluating the final *Escobar* factor, "we examine whether the defendants' alleged noncompliance was substantial."  *Strock*, 982 F.3d at 65.  Materiality "cannot be found where noncompliance is minor or insubstantial," *Escobar*, 136 S. Ct. at 2003, because material falsehoods are those that go to "the very essence of the bargain."  *Id.* at 2003 n.5.  This factor looks at the "contracts' purpose" and whether "the defendants' noncompliance deprived the government of [the] intended benefits" of the contract.  *Strock*, 982 F.3d at 65 (concluding that contractor's misrepresentation that it was owned by a service-disabled veteran was neither minor nor insubstantial because it went to the "heart" of the purpose of the statutory and regulatory regime – i.e., increasing contracting opportunities for small businesses owned by veterans with service-related disabilities).  Set against the backdrop of complex and voluminous regulatory and contractual requirements, "broad appeals" to the importance of a given regulatory requirement "cannot clear the rigorous materiality hurdle."  *United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 542 (10th Cir. 2020).  We instead look beyond "superficial designations," *Strock*, 982 F.3d at 59, to "whether [the relator] has demonstrated sufficiently widespread deficiencies" in the

contractor's performance or identified misrepresentations that go to the heart of the bargain, such that any regulatory, statutory, or contractual violations "would likely affect the Government's payment decision." *United States ex rel. Janssen*, 949 F.3d at 542; *see Strock*, 982 F.3d at 59, 65. Absent such a showing, it cannot be said that any such violations truly go the essence of the bargain.

Here, the purpose of the MOSC-A Contract was to "provide[] maintenance and management support services for the Army," which "included tactical vehicle and equipment maintenance, facilities management and maintenance, supply and inventory management, and transportation services." A.337-38 ¶ 43. Foreman alleges that because of the mission critical nature of these services, it was the expectation of the parties that AECOM "w[ould] strive to maintain (and improve) a high level of responsibility, management, and quality of performance throughout the life of this task order." A.338 ¶ 44. He contends that AECOM's labor billing, MHU rate, and property violations went to the essence of the bargain because AECOM was unable to maintain a high level of responsibility, management, and quality of performance.

It cannot be said, however, that AECOM's violations go to the heart of the bargain in the same way as the alleged misrepresentations in *Strock* did.

AECOM's timesheet violations, failure to properly input labor hours and MHU data into the requisite tracking systems, and failure to properly log and track government property – in the abstract – do not necessarily undermine the MOSC-A Contract's core purpose of providing management and support services for the army. We must therefore inquire as to whether these alleged violations are so pervasive that they would affect the government's payment decision.

With respect to the labor billing and property tracking allegations, we conclude that the substantiality factor weighs modestly in favor of a finding of materiality. Foreman alleges that the labor billing and timesheet fraud led to an estimated $140 million in overpayments and liability. In addition, Foreman alleges that AECOM noted in an internal corrective action report that it could face "significant liability" due to its failure to properly track property and credit the government. And Foreman emphasizes that an AECOM supervisor discovered $15 to 16 million in "improper or undocumented turned in recoverables from one system query only." A.428 ¶ 253. The significant financial costs to the government of the alleged labor billing and government property violations tend to weigh in favor of materiality because they suggest that the

alleged violations might affect the government's payment decision.

But Foreman fails to point to anything suggesting that AECOM's non-compliance with the MHU rate similarly resulted in significant financial costs to the government.  Based on the allegations in the Complaint, it seems likely that AECOM's MHU rate violations led to some inefficiencies and government waste.  But it is not apparent that they affected AECOM's ability to provide maintenance and management support services to the Army or deprived the Army of its expected benefits under the contract.  This weighs against a finding of materiality as to his claims premised on AECOM's failure to comply with the MHU rate.

### 4. *Conclusion*

In sum, weighing all these factors, we conclude that the district court erred in dismissing Foreman's § 3729(a)(1)(A) claims premised on AECOM's improper labor billing violations.  As noted, it was improper for the district court to consider the September 2014 DCAA Report at the motion-to-dismiss stage.  There is thus no evidence in the record demonstrating that the government had actual knowledge of AECOM's labor billing violations and nevertheless extended the MOSC-A Contract.  Rather, viewing the allegations in the light most favorable to Foreman, the complaint alleges more than the mere possibility that

the government would be entitled to refuse payment if it were aware of the labor billing violations.  Taken together with the substantiality factor, which also weighs in favor of materiality as to the labor billing allegations, Foreman has sufficiently pled materiality with respect to his claims premised on AECOM's labor billing practices.

We also conclude that the district court correctly dismissed Foreman's § 3729(a)(1)(A) claims premised on the MHU rate and property tracking violations.  The allegations in the complaint, coupled with the reports incorporated by reference into the complaint, demonstrate that the government had actual knowledge of AECOM's non-compliance with the MHU rate and failure to properly track government property.  Notwithstanding this, the government repeatedly paid AECOM's claims, extended the MOSC-A Contract, and increased funding under the MOSC-A Contract.  This provides ample evidence that the MHU rate and tracking of government property requirements were not plausibly material to the government's payment decision.  Such evidence proves decisive, as the condition of payment and substantiality factors

are, at best, marginally probative.  The district court therefore correctly dismissed these claims.[9]

### III.    False Records or Statements

31 U.S.C. § 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  For the same reasons set forth above in connection with Foreman's § 3729(a)(1)(A) claims, we conclude that Foreman has failed to adequately plead materiality with respect to his § 3729(a)(1)(B) claims premised

---

[9]  Foreman separately objects to the district court's dismissal of his § 3729(a)(1)(A) fraudulent inducement claim, arguing that the district court erred in dismissing it alongside his other § 3729(a)(1)(A) claims because it is "supported by different facts than his false certification claims."  Appellant's Br. 62.  Foreman argues that AECOM induced the Army to enter into and extend the MOSC-A Contract by making "misrepresentations to the government regarding its intention and ability to provide internal oversight over its operations, conceal[ing] its fraud from the government, and fraudulently induc[ing] each modification, extension, and award of the MOSC-A [Contract] by stating that it had complied with the requirements of the contract."  Appellant's Br. 62-63.  According to Foreman, AECOM's misrepresentations about its ability to provide oversight over its operations by efficiently using personnel and equipment and utilizing the required labor and property tracking systems, as well as its assurances to the government that it had complied with the MOSC-A Contract, "are distinct from AECOM's false claims of actual compliance with the specific contractual and legal requirements of the MOSC-A" Contract.  Appellant's Br. 63-64.  We fail to see how.  At bottom, Foreman's fraudulent inducement claim and his other § 3729(a)(1)(A) claims rest on the same alleged violations of the MOSC-A Contract.  Foreman's fraudulent inducement claim thus rises and falls with his other § 3729(a)(1)(A) claims.  However, to the extent the allegations underpinning his fraudulent inducement claim are somehow distinct from his other § 3729(a)(1)(A) claims, these conclusory allegations do not suffice to establish materiality with the required particularity.

on the MHU rate and government property tracking allegations.  The district

court therefore correctly dismissed those claims.

With respect to Foreman's § 3729(a)(1)(B) claims premised on the labor

billing allegations, however, Foreman has adequately pled materiality at this

stage of the case.  The district court therefore erred in dismissing Foreman's

§ 3729(a)(1)(B) claim premised on the labor billing allegations.

## IV.     Reverse False Claims

"Subsection (a)(1)(G) is referred to as the reverse false claims provision

because it covers claims of money *owed* to the government, rather than payments

*made* by the government."  *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43

F. Supp. 3d 332, 368 (S.D.N.Y. 2014) (emphasis in original) (internal quotation

marks omitted).  Section 3729(a)(1)(G) imposes liability on any person who

"knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the

Government."  31 U.S.C. § 3729(a)(1)(G).  Where a complaint "makes no mention

of any financial obligation that the [defendants] owed to the government," and

"does not specifically reference any false records or statements used to decrease such an obligation," a court should dismiss the reverse false claim. *Wood ex rel. United States v. Applied Rsch. Assocs., Inc.*, 328 F. App'x 744, 748 (2d Cir. 2009) (summary order); *see also United States ex rel. Hussain v. CDM Smith, Inc.*, No. 14 Civ. 9107 (JPO), 2017 WL 4326523, at *9 (S.D.N.Y. Sept. 27, 2017) (dismissing reverse false claim, because the plaintiff "d[id] not identify any existing financial obligation [that CDM] owed to the Government, let alone any specific false record or statement that [CDM] made to avoid such a purported obligation" (internal quotation marks omitted)). Rule 9(b)'s heightened pleading standard applies to reverse false claims. *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 249 (2d Cir. 2019) (summary order).

Foreman contends that he adequately alleged reverse false claims because the Complaint "identifies numerous separate obligations requiring AECOM to return excess money and property to the government." Appellant's Br. 68. Foreman points to allegations in the Complaint that AECOM had received over $144 million in overpayments from the government related to its alleged timesheet fraud and labor billing for "which there was an obligation to repay and/or remit such funds in various applicable regulatory and contractual

provisions in force between AECOM and the Army."  A.351 ¶ 76.  Foreman's reverse false claims thus boil down to the assertion that (1) the reverse false claims provision provides for liability on the part of those who avoid an "obligation" to pay the government, which includes retention of any overpayment; (2) AECOM received overpayments by virtue of its false certifications; and (3) AECOM violated the reverse false claims provision by failing to return those overpayments, even though it was required to do so by the MOSC-A Contract and applicable regulations.  His reverse false claims are therefore duplicative of his false claims under § 3729(a)(1)(A) and 3729(a)(1)(B).

Although we have yet to address this issue, several district courts, some of them within this Circuit, have concluded that a reverse false claim cannot turn on the same conduct underlying a traditional false claim.  *See, e.g.*, *United States ex rel. Gelbman v. City of New York*, No. 14 Civ. 771 (VSB), 2018 WL 4761575, at *8 (S.D.N.Y. Sept. 30, 2018) ("Relator's reverse false claim allegations – which essentially boil down to various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled – are not an adequate basis on which to allege a reverse false claim."), *aff'd*, 790 F. App'x 244 (2d Cir. 2019) (summary order); *United States v. Mount Sinai Hosp.*, 256

F. Supp. 3d 443, 458 (S.D.N.Y. 2017) ("The same allegations [that] state a claim under sections 3729(a)(1) and (2) [now §§ 3729(a)(1)(A) and (B)] . . . cannot also form the basis for a claim under subsection (a)(7) [now § 3729(a)(1)(G)]." (alterations in original) (internal quotation marks omitted)); *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 339 (S.D.N.Y. 2004) ("Because Taylor's allegations state a claim under sections 3729(a)(1) and (2), they cannot also form the basis for a claim under subsection (a)(7).").

Concluding otherwise would mean that "any time a defendant violated sub-sections (a)(1)(A) or (B) and received payment, the defendant would also necessarily violate sub-section (G) if it failed to repay to the Government the fraudulently-obtained payments." *Mount Sinai Hosp.*, 256 F. Supp. 3d at 458 (quotation marks omitted); *see also Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 97 (D.D.C. 2014) ("Relator attempts to argue that an obligation arose out of Defendants' concealment of their allegedly fraudulent activity. . . . But by this logic, just about *any* traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement actionable under § 3729(a)(1)(A) or 3729(a)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money." (emphasis in original)

(internal citation omitted)); *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010) ("Congress' purpose in enacting subsection (a)(7) was to ensure that one who makes a false statement in order to avoid paying money owed the government 'would be equally liable under the Act as if he had submitted a false claim to receive money.' Its purpose was not to provide a redundant basis to state a false statement claim under subsection (a)(2)." (internal citation omitted)). Accordingly, "[t]his type of redundant false claim is not actionable under subsection (a)(1)(G)." *United States ex rel. Davern v. Hoovestol, Inc.*, No. 11-CV-6630 (CJS), 2015 WL 6872427, at *9 (W.D.N.Y. Nov. 9, 2015).

Because Foreman's reverse false claims mirror his false claims under § 3729(a)(1)(A) and 3729(a)(1)(B), he fails to state plausible claims.

**V.     Conversion Claim**

The FCA's conversion provision "imposes civil liability on anyone who 'has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property.'" *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 438 (6th Cir. 2016) (quoting 31 U.S.C.

§ 3729(a)(1)(D)).  In 2009, Congress amended the FCA's conversion provision to eliminate its fraud requirement, replacing the "intent to defraud" requirement with a knowledge requirement.  *See United States ex rel. Harper*, 842 F.3d at 438-39. "Knowingly" means that a person (1) "has actual knowledge of the information; [(2)] acts in deliberate ignorance of the truth or falsity of the information; or [(3)] acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).  Section 3729(a)(1)(D) is intended to "allow[] the Government to recover losses that are incurred because of conversion of Government assets."  S. Rep. 111-10, at 13 (2009).

The district court dismissed Foreman's conversion claim, reasoning that the allegations in the Complaint failed to "identify any specific excess or recoverable item or other property that defendants possessed but failed to deliver to the government."  *United States ex rel. Foreman*, 454 F. Supp. 3d at 268. Foreman contends that the district court erred because the allegations in the Complaint "mentioned specific work orders for property that AECOM did not return to the government."  Appellant's Br. 66.  AECOM counters that Foreman "cannot point to any allegation of a specific piece of property that [it] supposedly converted (let alone that [it] did so 'knowingly')."  Appellees' Br. 55.

The Complaint alleges that AECOM utilized parts-only work orders to "bypass[] the property accounting and tracking systems required by the MOSC-A Contract." A.409-10 ¶¶ 204-06, A.412 ¶ 209. These parts-only work orders allegedly violated Performance Work Statements and FAR incorporated into the MOSC-A Contract, and "bypassed checks and balances built into the procurement system to avoid excessive ordering, and to make sure that the contractor was accountable to the Army . . . for the parts themselves." A.414 ¶ 216. Concerns about this practice surfaced in 2013, with inquiries being made to supervisors to determine whether there was some exception in place allowing parts-only work orders. In an email dated December 14, 2013, for example, Joseph Cox – the Training and Development Supervisor of AC First – explained that parts-only work orders were "not authorized" and that "all parts must either be ordered through the supply process, or through offline transaction." A.412-13 ¶ 210. The Complaint further indicates that in January 2014, AECOM personnel instructed other employees that parts-only work orders "would not be appropriate." A.413 ¶ 212. The third complaint lists several specific parts-only work orders that were nevertheless placed by AECOM employees, thereby violating the Army's accountability standards. A.414-15 ¶¶ 217-18. Nowhere in

70

the Complaint, though, does Foreman identify any specific piece of property obtained through those work orders that was not delivered to the government.

Instead, the Complaint alleges generally, and without specifying particular property, that:

- "AECOM was required to track and turn into the Army certain items that were removed from vehicles and other equipment, through a process known as 'recoverables.'" A.425 ¶ 240. According to Foreman, "[i]f the STAMIS systems were being used properly, items would be identified as recoverables in various ways." A.425 ¶ 242.

- AECOM failed to maintain adequate and complete records, and as a result, "on a wide-scale basis, the work order was not being properly created, closed or audited, resulting in recoverable items not being returned or duplicates not being controlled." A.425-26 ¶ 243.

- An email from a supervisor explained – in connection with one work order – that nine parts were ordered when only four were needed, and that this was a systematic issue, "leading to some of the excess parts issues we have run across." A.421 ¶ 234.

- An internal corrective action report issued by AECOM stated,

"Incorrect disposition has caused recoverable items to be left on AC FIRST SAMSIE database, and failure of proper credit to the USG [U.S. Government] and significant liability to AC FIRST."  A.427 ¶ 252.

- In March 2015, an AECOM Logistics Information System – Maintenance ("LISMX") supervisor "detailed $15-16 million of improper or undocumented turned in recoverables from one system query only."  A.428 ¶ 253, A.429 ¶ 260.

- AECOM allegedly instructed its employees to "purge recoverable items from the SAMSIE that can be removed without creating a system error."  A.428 ¶ 255.

- Senior Management at AECOM held multiple meetings with leadership after the LISMX supervisor raised concerns about AECOM's tracking of recoverables, but were allegedly "unable to grasp the full scope [of the problem] due to their limited understanding of the SAMSIE system and operations" and failed to adequately address the LISMX supervisor's concerns regarding AECOM's incomplete recordkeeping processes.  A.430 ¶ 262.

These allegations fail to state a plausible conversion claim under § 3729(a)(1)(D). First, as the district court pointed out, Foreman fails to identify "any specific excess or recoverable item or other property that [AECOM] possessed but failed to deliver to the government." *United States ex rel. Foreman*, 454 F. Supp. 3d at 268; *see also United States ex rel. Kasowitz Benson Torres LLP*, 929 F.3d at 728 (affirming dismissal of the plaintiff's conversion claim because the plaintiffs failed to adequately allege that the defendants possessed money or property to be used by the government). Rather, Foreman's allegations describe only general concerns with AECOM's recordkeeping practices, which may have led to inadequate tracking and return of recoverable items to the government.

Moreover, even if these generalized allegations regarding AECOM's failure to track and turn in recoverable items to the government were sufficient to establish that AECOM possessed, and yet failed to deliver, property to be used by the government, Foreman has not plausibly alleged that AECOM did so knowingly. The allegations in the complaint suggest instead that any failure to deliver government property resulted from widespread negligence rather than actual knowledge, deliberate ignorance, or reckless disregard. For example, the Complaint alleges that AECOM supervisors specifically instructed employees

not to utilize parts-only work orders and explained that all parts should be ordered "through the supply process, or through offline transaction." A.412-13 ¶¶ 210, 212. AECOM nevertheless struggled to track and return recoverables because certain employees failed to properly use the required tracking systems. These allegations appear to be indicative of widespread negligence and mismanagement rather than "knowingly" delivering, or causing to be delivered, to the government less than all of their property.

We therefore agree with the district court that Foreman failed to plausibly allege a conversion claim pursuant to § 3729(a)(1)(D).

## VI.  Public Disclosure Bar

AECOM argues, in the alternative, that even if the district court erred in dismissing any of Foreman's other claims for failure to state a claim, Foreman's claims premised on his labor billing, MHU rate, and property allegations separately fail under the public disclosure bar because these allegations were "contained in reports issued and otherwise disclosed by various Federal agencies."[10] Appellees' Br. 48. We disagree.

---

[10] Foreman contends that it is improper for AECOM to raise this issue on appeal without separately cross-appealing. But "we are free to affirm a decision [dismissing a complaint] on any grounds supported in the record, even if it is not one on which the trial court relied." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (alteration

The FCA's public disclosure bar reads:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> (i)    in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii)   in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii)  from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). The public disclosure bar was included in the 1986 amendments to the FCA, which endeavored "to strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud." *United States ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992).

The district court concluded that the relevant disclosures were not public because (1) the Department of Defense Inspector General report was the only

---

in original) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006)). Foreman's argument therefore lacks merit.

document that was clearly publicly disclosed, and that report failed to disclose the material elements of the property-related fraud alleged in the Complaint; and (2) the other government documents and communications relied on by AECOM were not disclosed to anyone outside the government and were therefore not public. *United States ex rel. Foreman*, 454 F. Supp. 3d at 261-64. The district court therefore held that it could not conclude as a matter of law, at the motion-to-dismiss-stage, that the public disclosure bar applied. *Id.* at 264. AECOM does not contest the district court's conclusion that the Department of Defense Inspector General report, standing alone, did not sufficiently disclose the material elements of the property-related fraud. Rather, AECOM contends that the district court erred because the other disclosures at issue were public.

Although we have yet to address this issue, "nine courts of appeals have held that the [public disclosure] bar applies only where there has been a disclosure *outside* of the government." *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 789 (S.D.N.Y. 2017) (emphasis in original) (collecting cases), *rev'd and remanded on other grounds*, 899 F.3d 163 (2d Cir. 2018); *see also United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d 260, 268 (6th Cir. 2015) ("[A]ll of the other circuits to [interpret the public disclosure bar] have held that

the plain meaning of § 3730(e)(4) requires some affirmative act of disclosure to the public outside the government." (collecting cases)); *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007) ("[A] 'public disclosure' requires that there be some act of disclosure to the public outside of the government. The mere fact that the disclosures are contained in government files someplace, or even that the government is conducting an investigation behind the scenes, does not itself constitute public disclosure."). Regarding *qui tam* actions based only on disclosures of information to the government, the Sixth Circuit reasoned:

> [t]he plain meaning of § 3730(e)(4) "does not bar jurisdiction over *qui tam* actions based on disclosures of allegations or transactions to the government," but "only for actions based on qualifying disclosures made to the public." *Rost*, 507 F.3d at 728. If a disclosure to the government in an audit or investigation would be sufficient to trigger the bar, the term "public" would be superfluous. . . . The public-disclosure bar "clearly contemplates that the information be in the public domain in some capacity and the Government is not the equivalent of the public domain." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1043 (10th Cir. 2004); *see also United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1518 (9th Cir. 1995) ("[I]nformation that was 'disclosed in private' has not been publicly disclosed.").

*Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d at 268-69. We find this reasoning persuasive and agree that disclosures to government officials do not constitute public disclosures for purposes of the public disclosure bar.

Here, as the district court noted, there are no allegations in the Complaint,

77

nor is there any evidence of which we are aware, that the key reports AECOM relies upon "were disclosed outside the government entities of the DCAA, DCMA, and Army." *United States ex rel. Foreman*, 454 F. Supp. 3d at 262. To the contrary, the October 2012 DCMA corrective action request discussing AECOM's low MHU rate is designated as "CONFIDENTIAL," and the September 2014 DCAA report which discloses AECOM's labor billing violations is labeled "FOR OFFICIAL USE ONLY," "CONFIDENTIAL – FOIA Exempt," and "Highly Confidential." A.514, A.551-52, A.615-16.

AECOM contends the public disclosure bar applies nevertheless because, in their view, the information in the reports became public as soon as the government released the reports to AECOM employees. AECOM points to "the fact that Foreman himself was actually able to access nearly all of these disclosures and incorporate them into his FCA complaint" as evidence that once the government released these reports to AECOM, they were accessible by innocent employees who were "strangers to the fraud." Appellees' Br. 50-52. To support its theory, AECOM relies on *John Doe Corp.*, but that case is distinguishable.

There, a former employee of John Doe Corp. contacted the Federal Bureau

of Investigation about the company's fraudulent billing practices in connection with services that it performed for the military under various defense contracts. *Id.* at 319. The government subsequently initiated an investigation. *Id.* Several months later, the investigators executed a search of John Doe Corp.'s premises. *Id.* During the search, the agents questioned John Doe Corp.'s employees and notified them that they were investigating allegations that the company was fraudulently overcharging the government under its defense contracts. *Id.* at 319-20. Many of the employees questioned had no knowledge of John Doe Corp.'s fraudulent billing practices. *Id.* at 320. The government's investigation ultimately targeted a particular employee, Ed Meyerson, who allegedly controlled the falsified records. *Id.* The government eventually granted Meyerson use immunity in exchange for his testimony, and Meyerson admitted that he had personally falsified John Doe Corp.'s records to overcharge the government. *Id.* During Meyerson's testimony, his attorney learned that the government had not yet instituted an FCA suit against John Doe Corp. *Id.* After consulting with his attorney, Meyerson signed a document waiving any interest he might have in the *qui tam* action and waiving the attorney-client privilege. *Id.* Meyerson's attorney then filed suit against John Doe Corp. *Id.* While the

complaint was under seal, the government moved as *amicus curiae* to dismiss the suit for lack of subject matter jurisdiction under the FCA's public disclosure bar. *Id.* The district court granted the motion. *Id.* at 320-21.

We affirmed, concluding that the lawsuit was barred because the allegations of fraud had been publicly disclosed. *Id.* at 322-24. In reaching this conclusion, we relied on the Third Circuit's decision in *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149 (3d Cir. 1991), which held that a *qui tam* suit was precluded by the public disclosure bar where an attorney learned of the allegations of fraud through discovery in litigation and there was no protective order in place limiting the use of such discovery materials. *See id.* at 1157-60. We reasoned that the public disclosure bar was "designed to preclude *qui tam* suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator," and therefore, "[p]otential accessibility by those not a party to the fraud [i]s the touchstone of public disclosure." *John Doe Corp.*, 960 F.2d at 322 (quoting *Stinson*, 944 F.2d at 1155-56). This rule, we explained, "distinguishes between information hidden in files or disclosed in private and information produced pursuant to the discovery process which is

presumptively, absent a court order, available for filing and general use." *Id.* (quoting *Stinson*, 944 F.3d at 1161).

Applying these principles to the case before us, we concluded that the allegations of fraud in *John Doe Corp.* were public because, in contrast to *Stinson*, "the allegations of fraud were not just *potentially* accessible to strangers, they were *actually* divulged to strangers to the fraud, namely the innocent employees of John Doe Corp." *Id.* (emphasis in original). "[M]any of these individuals knew nothing about defendants' ongoing scheme" and "were neither targets of the investigation nor potential witnesses"; rather, "they were strangers to the fraud." *Id.* at 322-23. And "[w]hen these innocent employees learned of the fraud, they were under no obligation to keep this information confidential." *Id.* at 323. We explained that "[o]nce allegations of fraud are revealed to members of the public with no prior knowledge thereof . . . they are irretrievably released into the public domain." *Id.*

*John Doe Corp.* does not control where, as here, there is no evidence in the record that the fraud allegations underlying the claims in Foreman's Complaint were disclosed to innocent employees at AECOM or that they were disclosed in the absence of an obligation to keep the information confidential. To the

contrary, as mentioned above, the reports on which AECOM relies are designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," suggesting that any disclosures to AECOM employees in connection with the government's audits and investigations were made under an obligation to keep such information secret. And as the district court noted, it "cannot be determined from the [Complaint] that Foreman was an 'innocent' employee or a 'stranger to the fraud'" and it is unclear "how or when Foreman accessed the government reports." *United States ex rel. Foreman*, 454 F. Supp. 3d at 263. Because there is no evidence that the fraud allegations were disclosed to individuals without prior knowledge of the fraud in the absence of a confidentiality obligation, the disclosures were not public and the public disclosure bar does not apply.

This conclusion is reinforced by the negative ramifications of AECOM's proposed public disclosure theory. If we were to adopt it, a relator who had personally observed and investigated fraud would be barred from bringing a FCA claim merely because he obtained access to a confidential government report describing the fraud. And it would also seem that, under AECOM's public disclosure theory, anytime the government has knowledge of the fraud and seeks corrective action from a contractor in connection with a confidential

investigative audit or investigation, a *qui tam* action would be barred. But such a restrictive interpretation of the public disclosure bar is inconsistent with the plain language and purpose of the public disclosure bar, because it would effectively collapse the public disclosure bar into the "government knowledge" standard that Congress eliminated and would undermine Congress's goal "of encouraging private citizens to expose fraud." *John Doe Corp.*, 960 F.2d at 321.

Other courts of appeal to address this question have similarly concluded that disclosures made pursuant to a confidential government investigation or audit do not constitute "public" disclosures within the meaning of the public disclosure bar. *See, e.g.*, *Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d at 265, 269-70 (rejecting argument that disclosures made to AdvanceMed and Deloitte in connection with confidential government investigation and audit constituted a "public" disclosure); *United States ex rel. Maxwell*, 540 F.3d at 1186 ("The e-mail exchange between Mr. Darouse and Mr. Geissel . . . was subject to confidentiality limitations because it was the product of an on-going government audit. . . . Therefore, the information was not within the public domain and the e-mail exchange was not a 'public disclosure' that would remove jurisdiction over Mr. Maxwell's suit from the courts."); *United States ex rel. Rost*, 507 F.3d at 728 ("The

mere fact that the disclosures are contained in government files someplace, or even that the government is conducting an investigation behind the scenes, does not itself constitute public disclosure.").  Indeed, allowing private suits when the information underlying the action is known only to government auditors and others involved in a confidential audit or investigation balances Congress's goals in encouraging private citizens with first-hand knowledge to expose fraud while avoiding civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud.  *See United States ex rel. Maxwell*, 540 F.3d at 1186.  Allowing such suits is also consistent with Congress's intent to prevent the government from sitting on fraud of which it had knowledge.  *Id.*; *see United States ex rel. Rost*, 507 F.3d at 730 (finding that it was Congress's intent, "through the requirement of public disclosure, to help keep the government honest in its investigations and settlements with industry.  Once allegations are made public, the government can be forced to act by public pressure").

For all these reasons, the district court correctly concluded that the public disclosure bar is inapplicable.

**CONCLUSION**

We have considered the parties' remaining arguments on appeal and conclude that they are without merit.  We therefore VACATE the judgment, REVERSE the district court's order dismissing the 31 U.S.C. § 3729(a)(1)(A)-(B) claims premised on the labor billing allegations, AFFIRM the dismissal of Foreman's other claims, and REMAND for further proceedings consistent with this opinion.